999 A.2d 450

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. SHEM WALKER, DEFENDANT–APPELLANT.

Argued March 9, 2010—Decided July 28, 2010.

74

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*LeeAnn Cunningham,* Special Deputy Attorney General/Assistant Prosecutor, argued the cause for respondent (*Robert D. Laurino,* Acting Essex County Prosecutor, attorney; *Ms. Cunningham* and *Hilary L. Brunell,* Special Deputy Attorney General/Executive Assistant Prosecutor, on the briefs).

*Natalie A. Schmid–Drummond,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

Justice WALLACE, JR., delivered the opinion of the Court.

This case implicates the four-prong statutory affirmative defense to felony murder, as set forth in *N.J.S.A.* 2C:11–3(a)(3)(a)–(d). Defendant Shem Walker was tried separately from codefendant Carl Trupaire on various charges arising out of the death of the victim, Albert Whitley. At trial, defendant presented evidence to show that he struck the victim once; did not know Trupaire had a weapon; watched Trupaire kick and hit the victim; and departed the scene while Trupaire was still fighting with the victim. The State presented sufficient evidence, including a prior statement by defendant that he entered the premises with Trupaire to rob the victim and that Trupaire stabbed the victim multiple times, for the jury to find defendant guilty of second-degree conspiracy to commit robbery, *N.J.S.A.* 2C:5–2, first-degree robbery, *N.J.S.A.* 2C:15–1, reckless manslaughter as a lesser-included offense of murder, *N.J.S.A.* 2C:11–4(b)(1), felony murder, *N.J.S.A.* 2C:11–3(a)(3), and fourth-degree possession of a weapon, *N.J.S.A.* 2C:39–4(d). The jury also found defendant not guilty of third-degree possession of a knife for an unlawful purpose, *N.J.S.A.* 2C:39–4(d). On appeal, defendant asserted reversible error in the trial court's failure to sua sponte charge the jury with the statutory affirmative defense to felony murder. In an unpublished opinion, the Appellate Division affirmed.

We granted defendant's Petition for Certification "limited to the issue of whether the trial court's failure to instruct the jury regarding the statutory affirmative defense to felony murder constituted plain error." 201 *N.J.* 146, 988 *A.*2d 566 (2009). We conclude that evidence in the record clearly indicated that the trial court should have sua sponte charged the jury with the statutory affirmative defense to felony murder. Nevertheless, because the findings of the jury negated most of the factors required to establish the affirmative defense, we find no plain error in this case.

I.

We recite the facts necessary to decide this appeal. The State presented evidence at trial to show that on the evening of January 23, 2003, Jazeer Redding was visiting the home of Albert Whitley, when he heard a knock on the door. Redding answered the front door and saw Trupaire and defendant, both of whom he knew from Irvington High School. Within five minutes of allowing the two young men to enter, Redding left the house. At that time, the house was both clean and in good order.

The following day, the Irvington police discovered Whitley lying on his back on the first floor of his home, with his hands and feet tied with tape. There were stab wounds on the victim's chest and neck, and he was not breathing. Investigators Fernand Williams Jr. and Robert Flanagan of the Essex County Prosecutor's Office investigated the incident. Williams described the house as being in "shambles and disarray." The evidence collected by the investigators included a ball of tape with possible bloodstains on it from the stairway leading to the second floor, a shoestring with possible bloodstains on it in the dining room, and a knife handle without a blade that was found in the pocket of a suede jacket. Additionally, the investigators collected swabs of blood from various locations throughout the house for DNA testing.

The investigation eventually led the police to defendant and Trupaire. Irvington Police Detective Harold Wallace testified

that he interviewed defendant on May 7, 2003. Wallace administered *Miranda*[1] warnings to defendant, who initially stated that he did not know Trupaire or the victim, and had never been to the victim's house.

The next day, Wallace resumed his interview with defendant. Defendant initially maintained his story from the previous day. He was then informed that his fingerprint had been found at the scene. Upon learning this, defendant demanded to see the fingerprint. After the fingerprint was produced, defendant admitted that he had visited Whitley's home on a prior occasion. In addition, defendant explained that he knew Trupaire and that it was Trupaire's idea to go to Whitley's home to rob him. He said that a young man, whom he did not know, answered the door and let the two of them into the home. The young man left after roughly twenty-five minutes, at which point defendant and Trupaire went upstairs to see Whitley. Trupaire started talking to Whitley and suddenly punched him. Defendant said that Whitley was bleeding and ran downstairs while Trupaire was in pursuit. Defendant also followed and saw Trupaire prevent Whitley from leaving the house. Whitley began fighting back, at which point defendant said he punched Whitley once in the face.

He said that Trupaire forced Whitley to the floor and told defendant to tape Whitley's legs. Defendant complied, but Whitley was able to break free, requiring defendant and Trupaire to use shoelaces to tie him. Defendant said he did not strike Whitley again, though Trupaire was kicking Whitley in the face and head. Defendant, believing Whitley had passed out, walked upstairs to look for money. Trupaire followed upstairs, at which point they found money in an envelope. The two returned downstairs where Trupaire stabbed Whitley as defendant stood by the door and watched. Defendant said that Whitley was still unconscious when Trupaire stabbed him. A short while later, defendant left the

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

house alone. Trupaire later caught up to defendant and gave him approximately $100.

When Wallace asked him if he wanted to add anything to his statement, defendant said he was sorry and did not realize "it was going to turn out to be like this." Defendant signed and dated the written statement prepared by Wallace during the interview.

At trial, Teri Mason McIntosh, a forensic scientist with the New Jersey State Police DNA Laboratory, testified that the blood swab taken from the entrance hallway precisely matched defendant's DNA profile at all thirteen locations. However, it was determined that defendant was not the source of the bloodstain on the tape found on the stairway. Instead, Eric Carpenter, a fingerprint analyst with the Federal Bureau of Investigation, testified that a latent fingerprint and palm-print found on the tape from the stairway were made by defendant. He found no prints on the knife handle or the tape used to tie the victim's hands and legs.

Dr. Noby Chipo Mambo, M.D., of the Essex County Medical Examiner's Office, who performed the autopsy on the victim's body, testified as an expert forensic pathologist. He explained that the victim's right thumb was "broken backwards," and that death was a result of twelve stab wounds to the neck "caused by a knife, or some sharp object." Dr. Mambo noted that the victim also suffered cuts to his chest, back, and upper abdomen, some of which were inflicted post-mortem.

Defendant testified in his defense. Notably, defendant's testimony was substantially different from his previous statement given to the police. He said that two days prior to the incident, he was in Whitley's house packing merchandise using clear tape. Defendant then outlined what happened on the day of the incident, explaining that he and Trupaire visited Whitley in an attempt to secure a Jamaican passport for Trupaire's brother. Defendant described how Trupaire unexpectedly hit Whitley in the head and that Whitley ran downstairs with Trupaire pursuing him. When defendant followed, he found the two men fighting and pushing one another. He admitted that he hit Whitley once in the face to

help defend Trupaire. Defendant explained that he cut his hand when he hit Whitley and then watched for five to ten minutes in a state of shock, as defendant kicked and stomped Whitley. Defendant eventually ran upstairs to retrieve his jacket and left the house. He never saw Trupaire use a weapon and denied going to the home to rob Whitley. Defendant claimed that he lied in his statement to Wallace because the detective threatened to throw him out the window if he did not talk. To avoid that, he answered the questions in the manner specified by Wallace.

During cross examination, defendant testified that he was packing boxes at Whitley's home two days prior to the murder, and he denied leaving blood on the packing tape. He acknowledged that he could have been bleeding on the night of the incident when he walked through the hallway as he left Whitley's home.

The trial court instructed the jury using the *Model Jury Charge (criminal)*, "Felony Murder—Non–Slayer Participant" (2004), with minor adjustments. Neither side requested a charge on the statutory affirmative defense to felony murder.

The jury found defendant guilty of second-degree conspiracy to commit robbery, first-degree robbery, first-degree felony murder, first-degree reckless manslaughter as a lesser-included offense of knowing or purposeful murder, and fourth-degree unlawful possession of a knife. Defendant was acquitted on the charge of third-degree possession of a knife for an unlawful purpose. At sentencing, the trial court merged defendant's convictions on conspiracy, robbery, and reckless manslaughter into the felony murder conviction and imposed a thirty-year term of imprisonment with a thirty-year period of parole ineligibility. The court additionally imposed a concurrent eighteen-month term for unlawful possession of a knife.

On appeal, in an unpublished opinion, the Appellate Division affirmed, rejecting defendant's contentions of error in the trial court's failure to sua sponte instruct the jury regarding the statutory affirmative defense to felony murder, and the failure to instruct the jury on "afterthought robbery." Defendant's motion

for reconsideration was denied. We granted defendant's Petition for Certification limited to the issue of whether the trial court's failure to instruct the jury regarding the statutory affirmative defense to felony murder constituted plain error. 201 *N.J.* 146, 988 *A.*2d 566 (2009).

We granted amicus curiae status to the Attorney General.

## II.

Echoing his arguments raised before the Appellate Division, defendant argues that the evidence at trial clearly indicated that the trial court should have instructed the jury on the statutory affirmative defense to felony murder, and that the failure to do so was plain error. He asserts that the four prongs of the statutory defense should be analyzed at the time a defendant ceases active participation in the crime, which is consistent with the Appellate Division's decision in *State v. Smith,* 322 *N.J.Super.* 385, 397, 731 *A.*2d 77 (App.Div.), *certif. denied,* 162 *N.J.* 489, 744 *A.*2d 1211 (1999), and that he presented evidence to satisfy each prong of the defense. Further, defendant criticizes the Appellate Division's invocation of the invited-error doctrine because the error he raised on appeal was never mentioned at trial, and therefore, not invited.

In contrast, the State argues that defendant was not entitled to have the jury instructed on the affirmative defense to felony murder because there was no evidence to support each of the four prongs of *N.J.S.A.* 2C:11–3(a)(3). The State adds that even when viewing the evidence in a light most favorable to defendant, the fourth prong of the defense, concerning whether defendant had reasonable grounds to believe that another person intended to engage in conduct likely to result in death or serious physical injury, could not be met, because defendant claimed no involvement in the underlying offense. He testified that he watched Trupaire beat the victim for five to ten minutes before he left the house. Further, the State asserts that defendant failed to request the charge, and the failure to give it was not plain error.

The Attorney General agrees with the State's arguments and contends that the evidence did not "clearly indicate" that the instruction was appropriate. The Attorney General notes that charging the affirmative defense would have contradicted defendant's theory of the case, and that defense counsel participated in drafting the felony murder jury charge that defendant now complains did not include the defense to felony murder.

III.

A.

We begin with a brief overview of the defense to felony murder. In *State v. Martin*, this Court traced the history of our felony murder statute and the rationale behind the enactment of the affirmative defense. 119 *N.J.* 2, 19–34, 573 *A.*2d 1359 (1990). In light of the potential unfairness of imposing strict liability on all participants in the underlying felony when a death occurs during the course of that felony, the New Jersey Law Revision Commission recommended that the Legislature adopt a statutory affirmative defense to felony murder. *Id.* at 22, 573 *A.*2d 1359 (citing II Criminal Law Revision Commission, *Final Report of the New Jersey Criminal Law Revision* § 2C:11–3 commentary at 156–58 (1971)). The purpose of the affirmative defense was to deal with a defendant who did not assume a homicidal risk in "an appropriate way by holding them responsible for the felony but not for the homicide." *Ibid.* (citation and internal quotation marks omitted). Thus, "the Commission recognized that not all participants in a multiple-perpetrator felony assume a homicidal risk." *Ibid.*

The Legislature later adopted *N.J.S.A.* 2C:11–3(a)(3), which provides an affirmative defense to a homicidal act if the defendant was not the only participant in the underlying crime and the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

The four prongs of the felony murder defense "focus on whether the accomplice undertook a homicidal risk or could have foreseen that the commission of the felony might result in death." *Martin, supra,* 119 *N.J.* at 22–23, 573 *A.*2d 1359. A defendant must present some evidence to support each of the four factors before a request to give the charge should be granted. *Smith, supra,* 322 *N.J.Super.* at 396–97, 731 *A.*2d 77. If defendant fulfills that responsibility, the burden then shifts to the State to disprove the defense beyond a reasonable doubt. *N.J.S.A.* 2C:1–13(b)(1)–(2); *see Smith, supra,* 322 *N.J.Super.* at 398, 731 *A.*2d 77.

This Court has not previously undertaken an analysis of the four prongs of the affirmative defense to felony murder. The parties cite only two Appellate Division cases that have addressed the issue, *Smith, supra,* and *State v. Sheika,* 337 *N.J.Super.* 228, 766 *A.*2d 1151 (App.Div.), *certif. denied,* 169 *N.J.* 609, 782 *A.*2d 427 (2001).

In *Smith, supra,* three people robbed a restaurant. 322 *N.J.Super.* at 391, 731 *A.*2d 77. During the course of the robbery, the manager was shot and killed by one of the perpetrators. *Id.* at 391–92, 731 *A.*2d 77. At trial, the defendant testified that he and his codefendants had agreed not to use any weapons, and that he was surprised when one of the codefendants brandished a gun. *Id.* at 392, 731 *A.*2d 77. At that point, each of them kicked and hit the victim who was on the ground and yelled at him to give them "the money." *Ibid.* When they decided to leave, the victim was holding one codefendant by the leg. *Ibid.* That same codefendant yelled to let go, and then shot the victim. *Ibid.* At trial, the trial judge provided an incomplete charge on the affirmative defense to felony murder. *Id.* at 395, 731 *A.*2d 77. The defendant was

convicted of felony murder, first-degree robbery, second-degree possession of a handgun for an unlawful purpose, third-degree hindering apprehension, and fourth-degree attempt to unlawfully dispose of a handgun. *Id.* at 389, 731 *A.*2d 77.

On appeal, the defendant asserted that the trial court failed to properly charge the jury on the affirmative defense to felony murder. *Id.* at 395, 731 *A.*2d 77. The panel noted that the trial court charged the affirmative defense to the jury, but failed to inform the jury that the State had the burden of disproving the defense beyond a reasonable doubt. *Ibid.* Nevertheless, the panel found that the error did not warrant reversal because the defendant was not entitled to have the jury charged on the felony murder defense, as the defendant's own testimony established that he continued his active participation in the robbery even after the handgun was displayed by a codefendant. *Id.* at 396–97, 731 *A.*2d 77. The panel added that

> it was not defendant's continued presence alone that negated the affirmative defense. Had the gun, for example, been suddenly drawn and fired before the defendant could react, the defense would have been in the case. Also, had defendant ceased his active involvement when the gun was drawn, a charge on the defense would have been required.
>
> [*Id.* at 397, 731 *A.*2d 77.]

In *Sheika, supra,* the defendant and the codefendant attacked a helplessly intoxicated victim and removed the victim's wallet and medallion. 337 *N.J.Super.* at 234, 766 *A.*2d 1151. A witness to the incident described how the defendant repeatedly kicked the victim and then fled. *Ibid.* The victim made his way back to the tavern, revealed that he had been kicked and punched, but refused medical treatment. *Id.* at 235, 766 *A.*2d 1151. Eventually, the victim went home and was found dead the next morning. *Ibid.* The autopsy revealed that lacerations of the spleen, combined with contusions, an intra-abdominal hemorrhage and rib fractures were the cause of death. *Ibid.* The defendant was convicted of felony murder, second-degree conspiracy, and second-degree robbery. *Id.* at 234, 766 *A.*2d 1151.

On appeal, the defendant challenged the failure of the trial court to instruct the jury on the statutory affirmative defense to felony murder. *Id.* at 250–51, 766 *A.*2d 1151. The panel found no evidence in the record to support a contention that the defendant did not participate in the commission of the homicidal act. *Id.* at 251, 766 *A.*2d 1151. Further, the panel determined that any claim of error in defense counsel's acceding to the trial court's decision to charge the statutory defense for the codefendant's conduct, but not for the defendant's conduct, did not have the capacity to lead to an unjust result. *Ibid.*

## B.

This appeal presents the issue of when a trial court should instruct the jury on the defense to statutory felony murder in the absence of a request to charge from counsel.

For guidance, we look to the standard that we require concerning a trial court's duty to charge the jury sua sponte with lesser-included offenses. *See State v. Denofa,* 187 *N.J.* 24, 41, 898 *A.*2d 523 (2006) ("In setting standards for when the trial court must charge the jury on territorial jurisdiction, we find an apt paradigm in our lesser included-offense jurisdiction."); *State v. Robinson,* 136 *N.J.* 476, 489, 643 *A.*2d 591 (1994) (in addressing when court should submit lesser-included offense of attempted passion/provocation manslaughter to jury in absence of request, we stated "that it is only when the facts clearly indicate the appropriateness of that charge that the duty of the trial court arises." (citation and internal quotation marks omitted)). We emphasized in *Denofa, supra,* that in the absence of a request to charge, "[o]nly if the record clearly indicates a lesser-included charge ... must the court give the required instruction." 187 *N.J.* at 42, 898 *A.*2d 523. To be sure, when counsel requests such a charge, the court should give the charge if there is a rational basis in the record for doing so. *Ibid.* In any event, "when the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in

search of any combination of facts supporting a lesser-included charge." *Ibid.*

We hold that those standards apply when considering whether to charge a jury with the defense to felony murder. That is, if a defendant requests a charge on the defense and there is a rational basis in the record to give it, then the court should give the requested instruction. On the other hand, if counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it.[2]

### C.

We turn now to evaluate defendant's contention that the evidence in the record clearly indicated that the trial court should have charged the jury with the statutory affirmative defense to felony murder. Defendant had the burden to produce some evidence in support of each prong of the defense, irrespective of whether there was strong evidence to the contrary. *See N.J.S.A.* 2C:1–13(b).

The record reveals that defendant testified that he did not assist in the homicidal act in any way. Further, although he admitted to punching the victim once in the face, he asserted that he did not commit that act to assist Trupaire in robbing or killing the victim, but rather to help defend Trupaire. Moreover, he asserted that the reason for and the outcome of the altercation was not certain when he ceased participating in the fight. Thereafter, defendant claimed that he stood in the hallway "in shock" for five to ten minutes while Trupaire continued to fight with the victim. Addi-

---

[2] The State notes in its brief that defense counsel did not serve notice on the prosecutor that it intended to rely on the affirmative defense under *N.J.S.A.* 2C:11–3(a)(3) as required by *Rule* 3:12–1. The State refers to that shortfall as additional justification for the lack of the affirmative defense charge and in support of its position that the charge would have been inconsistent with defendant's claim of innocence. Because we conclude that the failure to give the charge was not plain error, we need not address this point.

tionally, defendant denied that he helped Trupaire bind the victim and said that he never saw Trupaire with a knife.

The State argued, and the Appellate Division agreed, that even if the jury accepted defendant's trial testimony, his testimony established that he had a reasonable ground to believe that Trupaire intended to inflict at least "serious physical injury" upon the victim, and thus the defense would not apply. Further, the Appellate Division rejected defendant's claim that the felony-liability "clock" stopped running after defendant inflicted his single punch to the victim, and instead concluded that "had the Legislature intended to essentially 'stop the clock' at the moment a defendant's own active participation comes to an end, it would have so stated."

We are not convinced by either the State's argument or the reasoning of the panel. In *Smith, supra*, while addressing the factor of whether the defendant had knowledge that a weapon would be used, the panel emphasized that, assuming the other prongs of the test were met, if the weapon were "suddenly drawn and fired before the defendant could react, the [affirmative] defense would have been in the case." 322 *N.J.Super.* at 397, 731 *A.*2d 77. The panel also declared that "had defendant ceased his active involvement when the gun was drawn, a charge on the [affirmative] defense would have been required." *Ibid.* We agree with that analysis.

Applying that same reasoning to the present matter, it is for the factfinder to determine when defendant ceased participating in the wrongful conduct and whether at that time defendant had "no reasonable ground to believe that Trupaire intended to kill or inflict serious physical injury on the victim." There was evidence in the record for the jury to reasonably find that defendant punched the victim to help defend Trupaire, and that once he punched the victim, he ceased his active involvement. Although defendant admitted to standing in the hallway for five to ten minutes while Trupaire continued to attack the victim, defendant also testified that just prior to his departure words were being

exchanged between the victim and Trupaire. Thus, if the jury believed defendant's testimony, then the jury could find that defendant had interceded in a contested fight between two individuals and that he ceased participation in the fight at a point when he "had no reasonable ground[s] to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury." *N.J.S.A.* 2C:11–3(a)(3)(d).

■  In sum, so long as there is some evidence pertaining to each of the four prongs of the defense, whether produced in the State's case or in defendant's case, the instruction on the affirmative defense to felony murder should be given to the jury. *See State v. Kelly*, 97 *N.J.* 178, 200, 478 *A.*2d 364 (1984) (noting "if any evidence raising the issue of self defense is adduced, either in the State's or the defendant's case, then the jury must be instructed" on self-defense). We are satisfied that defendant's trial testimony raised a factual dispute that clearly indicated that a jury charge on the defense to felony murder should be given. That is, if the jury believed defendant's trial testimony, there was evidence in the record to satisfy each of the factors needed to establish the defense to felony murder. Under those circumstances, the trial court was required to sua sponte render an appropriate charge.

## IV.

■  That determination does not end our analysis. The question remains whether the failure to instruct the jury on the affirmative defense to felony murder deprived defendant of a fair trial. Defendant did not object to the jury charge at trial and raised the claim of error for the first time on appeal. Consequently, we must consider this issue under the plain error rule. *R.* 2:10–2.

■  We will reverse for unchallenged error if we find the error was "clearly capable of producing an unjust result." *Ibid.* (also known as "plain error standard"). Conceptually,

> [i]n the context of a jury charge, plain error requires demonstration of legal impropriety of the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.
>
> [*State v. Burns*, 192 *N.J.* 312, 341, 929 *A.*2d 1041 (2007) (citation, alteration and internal quotation marks omitted).]

The error must be considered in light of the entire charge and must be evaluated in light "of the overall strength of the State's case." *State v. Chapland*, 187 *N.J.* 275, 289, 901 *A.*2d 351 (2006) (citation omitted). "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are poor candidates for rehabilitation under the plain error theory." *State v. Adams*, 194 *N.J.* 186, 207, 943 *A.*2d 851 (2008) (citations and internal quotation marks omitted).

In the present case, the trial court should have instructed the jury on the affirmative defense to felony murder. However, as noted, defendant neither requested that instruction, nor did he object to the instructions that were given. The question is whether in the context of defendant's trial, an unjust result occurred.

In that regard, we note that in addition to felony murder, the jury convicted defendant of conspiracy, robbery, reckless manslaughter as a lesser-included offense of knowing or purposeful murder, and possession of a knife. For those convictions, the jury had to conclude that defendant aided the commission of the homicidal act, (reckless manslaughter); possessed a deadly weapon, (possession of a knife); had reason to believe the codefendant was armed with a knife, (conspiracy and reckless manslaughter); and engaged in conduct likely to result in death or serious physical injury, (reckless manslaughter). Thus, the jury, although not charged with the affirmative defense to felony murder, found against defendant on most, if not all, of the four prongs of the defense.

Based on the totality of these circumstances, we do not believe that the failure to give the omitted charge on the defense to felony

murder would have altered the jury's conclusions. Indeed, the charges given did not preclude the jury from finding in defendant's favor on the same issues that directly implicated the affirmative defense to felony murder, but the jury determined otherwise. Under these circumstances, we find no justification to order a new trial.

## V.

The judgment of the Appellate Division is affirmed but for different reasons.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.